### UNITED STATES  DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**JOHNNY LUNA, # 385808**                                     **CIVIL ACTION**

**VERSUS**                                                                **NO. 03-3237**
                                                                               **c/w 04-1453**

**BURL CAIN, WARDEN**                                       **SECTION "M" (6)**

### <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

### I.  PROCEDURAL HISTORY

On June 26, 1997, petitioner, Johnny Luna, a state prisoner presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana, was found guilty,

following trial by jury, on two counts of forcible rape.[1]  On March 30, 1998, petitioner was sentenced, as a multiple-offender, to two 80-year terms of imprisonment to be served consecutively.[2]  On October 31, 2000, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence.  *State v. Luna*, 772 So.2d 249 (La. App. 5 Cir. 2000).[3] Approximately one year later, on October 12, 2001, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and sentence final.  *State v. Luna*, 799 So.2d 495 (La. 2001).

Once his state direct appeal proceedings were completed, petitioner filed numerous post-conviction pleadings within the state court system.  His efforts in this regard culminated on April 2, 2004, when the Louisiana Supreme Court issued two decisions denying petitioner relief.  *See State ex rel. Luna v. State*, No. 2003-KH-0855, 869 So.2d 865 (La. 2004); *State ex rel. Luna v. State*, No. 2003-KH-2443, 869 So.2d 873 (La. 2004).

Petitioner filed the instant application for federal habeas corpus relief, raising the following issues:  1) Whether his conviction rests upon manufactured and fabricated evidence; 2) whether the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 3) whether appellate counsel was ineffective;

---

[1]*See* State rec., vol. 18 of 32, p. 398.

[2]*See* State rec., vol. 18 of 32, p. 506 and vol. 22 of 32, p. 1528, lines 20-24.

[3]The state appellate court, however, remanded the matter, ordering the state district court to "amend the commitment to reflect that defendant's enhanced sentence was imposed without benefit of parole, probation, or suspension of sentence, and to inform the defendant of the delays for filing post conviction relief and place in the record written proof that defendant received such notice." *Id*. at 260.

4) whether he should have been tried separately with respect to the two forcible rape charges lodged against him; 5) whether or not prosecutorial misconduct took place due to the alleged deliberate elicitation of perjured testimony and false evidence; 6) whether petitioner was wrongfully allowed to proceed *pro se,* i.e., allowed to represent himself at trial while being incompetent to do so, thereby being denied his right to counsel and/or denied his right to substitute counsel;[4] 7) whether he received ineffective assistance of counsel during pre-trial and trial; and, 8) whether he was improperly denied his right to present a defense. The State does not contest the timeliness of the above claims, but does contest whether or not petitioner, with respect to some of his arguments supporting the above claims, has exhausted his state court remedies, as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), and therefore, whether or not he is in procedural default with respect to said claims. However, under the provisions of 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Accordingly, despite petitioner's alleged failure to exhaust his state court remedies with respect to particular arguments supporting some of his claims, this court shall, nevertheless, address these unexhausted arguments on the merits.

---

[4]Issue 6), set forth above, constitutes a combination of issues 6), 7), 8), and 9) listed on p. 7 of petitioner's federal habeas corpus application.

## II.  FACTS[5]

      This case arises out of charges that the defendant committed forcible rape upon Sharon Narretta on August 13, 1995, and upon Mary Wyant on September 6, 1995.  Both victims testified that, on separate occasions, they were overcome by force and vaginally raped by the defendant at his apartment after meeting the defendant at a bar for the first time. To the contrary, the defendant testified that the intercourse was consensual.

      With respect to the August 13, 1995 incident, Ms. Narretta testified that in the early morning hours of August 13, 1995, she and a friend were on Jefferson Highway when her truck stalled.  The friend walked to her home, which was close to where the truck had stalled.  Ms. Narretta walked to Wolfman Henry's, a nearby lounge, to obtain some aspirin. The defendant, who was also at the bar, struck up a conversation with Ms. Narretta.  She also met the bartender, Janelle, and her boyfriend, "Boogie."  When Janelle closed up the lounge, the four decided to have a drink elsewhere.  Janelle and Boogie drove the defendant and Ms. Narretta to Winn Dixie, where the defendant purchased some liquor.  Thereafter, Boogie and Janelle drove to the defendant's apartment, but did not come in.  Ms. Narretta said she asked Janelle if she knew the defendant, and Janelle replied affirmatively.  Ms. Narretta then accompanied the defendant inside his apartment, in Jefferson Parish.

      Once inside, the defendant began cutting up chicken to cook for them, and fixed drinks for Ms. Narretta and himself.  Ms. Narretta, who lived with her father, went into

---

[5]The facts are taken from the state appellate court's opinion on direct appeal, *State v. Luna*, 772 So.2d 249 (La. App. 5 Cir. 2000).

the living room to telephone her father to let him know she would be home soon.  When she picked up the phone, however, there was no dial tone.  She saw that the phone was unplugged and reached to plug it in.  As she did so, the defendant came from behind her and put his arms around her neck in a "choke hold."  She could not breathe and began to panic. The defendant then said for her to remove her "M. F-ing" clothes.  She said that she did not remember whether she removed her clothes because she was afraid or whether the defendant took them off.  Nonetheless, she testified that the next thing she knew, the defendant pushed her face down into the mattress, put his penis inside of her vagina and raped her by force. The defendant did not ejaculate.  At trial, Ms. Narretta said that the rape caused bleeding inside her vagina.  She also stated that she no longer menstruated because she had entered menopause.

After it was over, Ms. Narretta said that the defendant walked into the kitchen and resumed cooking.  Ms. Narretta said that she was terrified because she kept thinking about the large knife he had used to cut up the chicken.  She tried to think of a way to escape without arousing the defendant's suspicions, so she told him she was cold and had to get dressed.  Eventually, the defendant went to the restroom, and Ms. Narretta used the opportunity to flee the defendant's apartment.  In her haste, however, she left her shoes.  She ran barefooted for some distance and hid in the bushes until daylight.  When it was light, she called the police from a nearby lounge and Sergeant Ferd Hebert of the Jefferson Parish Sheriff's Office responded.

Sergeant Hebert testified he was dispatched to the Silver Spur lounge at

5

approximately 6:26 a.m. where he met with Ms. Narretta.  After Ms. Narretta related the morning's events, Sergeant Hebert took her to Lakeside Hospital where she was examined by Dr. Michael Wiedemann, who was accepted at trial as an expert in the fields of general medicine, gynecology and sexual assault examinations.

Dr. Wiedemann testified that the external physical examination did not reveal any visible lacerations or bruises on Ms. Narretta's body.  He said, however, that the internal pelvic examination revealed a bloody discharge from Ms. Narretta, which could have been caused by blunt trauma.  He found no evidence of semen, but he explained that he did not expect to find any since Ms. Narretta said her attacker did not ejaculate.

After Ms. Narretta's examination, Sergeant Hebert recovered the victim's shorts. Later in the day, Sergeant Hebert and another officer went to the defendant's apartment, informed the defendant that a forcible rape complaint had been made against him, and advised him of his constitutional rights.  The defendant agreed to allow the officer to search his apartment.  Sergeant Hebert recovered the bed sheet, as well as Ms. Narretta's shoes, and photographed the scene.   According to Sergeant Hebert, the defendant spontaneously remarked during the search of his apartment that the "incident was consensual."

Some of the evidence collected by Sergeant Hebert was tested by forensic serologist, Pamela Williams.  Ms. Williams testified that stains on the bed sheet and the crotch of Ms. Narretta's shorts tested positive for the presence of blood.  The stains on the sheets were insufficient for any further testing, but the blood on Ms. Narretta's shorts was consistent with her blood type.  Ms. Williams stated that she did not detect the presence of

seminal fluid on any of the samples she tested.

Paul Petta testified on behalf of the defense in regard to the charges involving Ms. Narretta.  Mr. Petta stated that he and Ms. Narretta previously lived in the same apartment complex.  He said that Ms. Narretta was a "nervous" person, and that she had falsely accused him of breaking into her apartment.  He also claimed he had observed Ms. Narretta using crack cocaine.  Petta admitted he was a drug addict himself, with several simple burglary convictions, four possession of heroin convictions, and stated that he was facing a life sentence for his recent distribution of heroin conviction.

The defendant testified at trial, and his testimony was substantially the same as Ms. Narretta's testimony regarding their initial meeting and arrival at his apartment. However, the defendant stated they engaged in consensual oral sex and intercourse. Defendant admitted that he did not ejaculate.  According to the defendant, Ms. Narretta asked him to give her $60.00 to purchase some crack cocaine, which Ms. Narretta had denied during her testimony.  Defendant denied raping Ms. Narretta and speculated that Ms. Narretta had fabricated the instant charge in retaliation for his refusal to give her the money she requested.

The defense also called as a witness Officer Nathaniel Riley of the Jefferson Parish Sheriff's Office.  Riley stated that he and Officer Marcus Toony were dispatched after Ms. Narretta telephoned the police from the Silver Spur lounge.  Officer Riley observed that Ms. Narretta was "hysterical."  The officer stated he was not present when Officer Toony wrote the police report, and did not know Officer Toony's whereabouts at the time of trial.

With respect to the September 6, 1995 incident, Mary Wyant testified that she met her boyfriend at the Silver Spur Lounge at 4:30 p.m. and they had an argument. After the argument, her boyfriend left, but Ms. Wyant decided to stay to have a few drinks. The defendant was in the bar and offered to buy Ms. Wyant a drink, but she told the defendant she wanted to be left alone. After a while, the defendant engaged her in conversation and she accepted a drink from him. A short time later, the defendant suggested that they retire to his apartment for drinks. Ms. Wyant rejected his offer, but proposed that they have drinks and talk at her apartment instead. She suggested that the defendant follow her in his car, but she said the defendant told her he could not do that because he had left his vehicle at home. Ms. Wyant and the defendant then left the bar in Ms. Wyant's car. On the way to her apartment, they stopped to purchase some liquor, and then they stopped at the defendant's apartment because he claimed he needed to change his clothes. Ms. Wyant initially planned to wait in her car for the defendant, but he suggested that she come inside because it was hot in the car.

Ms. Wyant went inside his apartment, and while there, the defendant talked about beginning a relationship with Ms. Wyant. She told him she was not interested, since her current relationship was troubled. Despite her response, Ms. Wyant said the defendant tried to kiss her, but she pushed him away. Thereafter, Ms. Wyant became ill and was sick in the bathroom. When she walked out of the bathroom, the defendant grabbed her from behind and began undoing her belt. She resisted the defendant, but he threw her on the bed and pushed her down, holding her throat. Ms. Wyant said that he then forced her to have sexual intercourse. After that was over, the defendant performed oral sex upon her. She

8

thought, at that point, that he was going to let her leave, but as she began putting her clothes on, the defendant forced her to perform oral sex upon him.  Ms. Wyant said that the defendant did not ejaculate during these incidents.

The defendant then handed Ms. Wyant her clothes, and after she dressed, the defendant insisted that she remain because he wanted to discuss having a relationship with her.  In the course of the conversation, Ms. Wyant told the defendant he had hurt her while in the bedroom.  In response, the defendant, according to Ms. Wyant, "flipped again," straddling her lap, putting his hand against her windpipe, and telling her that he would "show [her] what rape is."  At that point, Ms. Wyant, fearing for her life, tried to diffuse the situation by apologizing.  Ms. Wyant's apology seemingly calmed defendant down and he proceeded to write his telephone number on a piece of paper so that she could call him later.  Thereafter, the defendant insisted on walking Ms. Wyant to her car and she drove to her apartment.

When Ms. Wyant reached her apartment, she made three phone calls:  One to the defendant, one to her best friend, and the third to the police.  She told the defendant that she was reporting the rape to the police, and that they would be on their way to his apartment.  She said she told him she had merely pretended to mollify him because she was afraid of him.

Ms. Wyant was interviewed by the police on the night she reported the rape.  Thereafter, she went to Lakeside Hospital, where she was examined by Dr. Wiedemann at approximately 11:57 p.m.  At trial, Dr. Wiedemann testified that Ms. Wyant was very upset and complained her neck was sore from being held down by her attacker.  He stated that the

external examination showed no signs of lacerations or bruises, but that the complaint of rape was consistent with the history of events related by Ms. Wyant.

Defendant's trial testimony was substantially the same as Ms. Wyant's testimony regarding their initial meeting and arrival at his apartment.  He pointed out, however, that he did not own a car at the time, despite Ms. Wyant's testimony to the contrary. He also claimed that he and Ms. Wyant had consensual intercourse after she removed her clothes.  He denied choking her, but admitted that she started crying while they were having sex.  Defendant said that when she started crying, he stopped, told her to get dressed, then asked her to sit down and talk for a while.  During this conversation, she informed him that she had been raped in the past, and he admitted to her that he previously had been accused of rape.  Defendant stated that soon thereafter, he walked Ms. Wyant to her car and later received a telephone call from her informing that the police were on their way to his apartment.  According to the defendant, he did not understand anything else she said because she was "hysterical."

On cross-examination, the defendant admitted he had prior convictions, including forcible rape when he was 16 years old, burglary when he was 20, attempted escape at 22, kidnaping for ransom when he was 30, as well as miscellaneous misdemeanor convictions.  At the time of trial, defendant said he was 47 years old.

Bonnie Dubourg, an expert forensic serologist, was called as a defense witness. She testified that she conducted testing on the evidence collected from Ms. Wyant.  She said that test results were negative for the presence of blood and seminal fluid on the evidence she

examined.

Deputy Rosato, another defense witness, testified that she was dispatched to Ms. Wyant's apartment on the evening of September 6, 1995, regarding a call of forcible rape. The deputy said that Ms. Wyant was visibly upset and crying when she arrived at Ms. Wyant's apartment. According to Deputy Rosato, Ms. Wyant related that she had been forced to have vaginal sex with a white male.

Detective Michael Carrone, also called by the defense, testified that he, too, was dispatched to Ms. Wyant's apartment. Detective Carrone said that after interviewing Ms. Wyant, he went to the defendant's apartment at about 11:05 p.m. He said the defendant was cooperative. Detective Carrone said that he learned on the following day that Ms. Narretta had made a complaint of rape against the defendant. The detective further stated that after additional investigation, a warrant for the defendant's arrest was ultimately obtained.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as

determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210 F.3d 481, 485

(5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant
> the writ if the state court arrives at a conclusion opposite to that reached by
> this Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the writ
> if the state court identifies the correct governing legal principle from this
> Court's decisions but unreasonably applies that principle to the facts of the
> prisoner's case.

*Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210

F.3d at 485.  As to questions of fact, factual findings are presumed to be correct and a federal

court will give deference to the state court's decision unless it "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S. C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1); *Hill*, 210 F.3d at 485.

## IV.  ANALYSIS

### Claim 1:  Whether Conviction Rests Upon Fabricated Evidence

Petitioner claims that in connection with Ms. Narretta's rape charge, the

"employees of the Jefferson Parish Sheriff's Department fabricated the alleged crime scene"

in the following two respects:  1) They "plant[ed] a blood spot – as big as a silver dollar –

in the center of his bed sheet"; and, 2) they planted "a pair of blue thong-type shower shoes

... in the middle of [his] living room floor."[6]  In its response, the State notes that the instant

claim was raised in connection with one of petitioner's state post-conviction applications

---

[6]*See* Federal rec., doc. 1, petitioner's habeas application at p. 9.

which the state district court denied on June 24, 2003, determining, based upon its review of the state court record, that there were no "inconsistences which would prove the State fabricated the crime scene."[7]

As the State points out, the above finding on the part of the state court, that there were no inconsistencies which would prove any fabrication of the crime scene, constitutes a finding of fact which, under 28 U.S.C. § 2254(e)(1), is entitled to a presumption of correctness.[8] Further, the fact that blood was associated with petitioner's sexual encounter with Ms. Narretta was supported by the testimony of Dr. Michael Wiedemann, a licensed physician in the private practice of obstetrics and gynecology. Based upon the notes he made in connection with the "sexual assault examination" he performed on Sharon Narretta hours after the incident occurred, Dr. Wiedemann testified:

> A. I've noted on the cervical exam that there was a mild, bloody discharge coming from the cervix.
> Q. And, Doctor, in your expert opinion, what could have caused a mild bloody discharge from the cervix?
> A. Many things can cause a bloody discharge, but certainly any blunt trauma to the cervix can cause a bloody discharge.[9]

Additionally, the fact that Ms. Narretta left her shoes in petitioner's apartment was confirmed by petitioner. Specifically, petitioner testified: "I don't know what the big issue is about the shoes, anyway. I admitted that they were there. I admitted that I told the

---

[7]A copy of the state district court's June 24, 2003 Order is contained in the State rec., vol. 8 of 32, tab 12.

[8]*See* Federal rec., doc. 27, State's response at p. 20.

[9]*See* State rec., vol. 21 of 32, p. 1097, lines 13-21.

detective that they were there.  I don't know what the big issue is about the shoes."[10]

Accordingly, petitioner's claim for habeas relief based upon the State's alleged fabrication

of evidence is without merit.

### Claim 2:  *Brady* Evidence Withheld

"The prosecution's suppression of evidence favorable to the accused violates

the Due Process Clause if the evidence is material either to guilt or to punishment."

*Kopycinski v. Scott*, 64 F.3d 223, 225 (5th Cir. 1995), citing *Brady v. Maryland*, 373 U.S. 83,

87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).   Under *Brady* and its progeny, the

prosecution is required to disclose to the defense both exculpatory evidence and evidence that

would be useful for impeachment.  *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196; *Giglio v. United

States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S.

667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).   Thus, to prove a constitutional

violation as contemplated under *Brady*, there must be a suppression of evidence which is both

favorable to the accused, in terms of being exculpatory and/or useful for impeachment

purposes, and material to his or her guilt or punishment.[11]   Materiality is established "if there

is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct.

---

[10]*See* State rec., vol. 22 of 32, p. 1445, lines 26-32.

[11]That the suppressed evidence be material is a requirement regardless of whether said evidence is characterized as exculpatory or useful for impeachment purposes.  *See Giglio*, 405 U.S. at 154, 92 S.Ct. at 766 (materiality requirement applicable in situation where suppressed evidence was the fact that an agreement not to indict had been reached between prosecution and "star" prosecution witness).

1936, 1948, 144 L.Ed.2d 286 (1999) (quotation and citation omitted).

Petitioner claims that the State unconstitutionally suppressed a full criminal history for one of the victims. Review of the state court record reflects that in March, 1997, the defense filed a motion for the State to produce the criminal history for both victims, Sharon Narretta and Mary Wyant. In April, 1997, petitioner filed an "Amendment to Motion for Criminal History" requesting that criminal histories also be provided for "Sharon Wassner", "Sharon Gonzales", and "Sharon Silvestri" since Sharon Narretta, "from either marriage or otherwise", had used these names in the past.[12] The State, however, did not "run" a rap sheet for all four names, stating, at the June, 1997 trial: "We had no knowledge of other names. We didn't run the rap sheet on those. We knew her as Sharon Narretta. That's the name she testified under, and that's the name we ran the rap sheet [under]."[13] The above statement was offered by the prosecution in response to petitioner's motion for a mistrial based upon the fact that he had requested Narretta's criminal history and the State had represented that she had no criminal convictions, yet Narretta testified at trial that she had a prior drug conviction.[14]

In the instant habeas application, petitioner claims that Narretta's full criminal history would have revealed convictions related not only to Narretta's drug use, but also to her involvement in prostitution. Petitioner, therefore, requests that this court "call up her

---

[12]A copy of petitioner's amended motion is attached to his petition as part of "Appendix B".

[13]*See* State rec., vol. 21 of 32, p. 1159.

[14]*See* State rec., vol. 21 of 32, p. 1078.

criminal history under the last names that he provided, to make a determination regarding the impeachment value and character of her past criminal history...."[15]

In accordance with the above request, the court ordered the State to produce, for its in camera review, the criminal history for not only Sharon Narretta, but also for Sharon Wassner, Sharon Gonzales and Sharon Silvestri.[16]   Said review has revealed that in addition to the one marijuana possession conviction which Narretta admitted to at trial, she had another marijuana possession conviction, along with a conviction for possession of desoxyn, a methamphetamine.[17]   Contrary to petitioner's assertion, there is no evidence that Narretta was ever involved in any prostitution activity.

In light of the fact that the jury was aware of Sharon Narretta's past involvement with drugs,[18] the court finds that the above-described evidence, under the

_____

[15]*See* Federal rec. doc. 1, petitioner's habeas application at p. 18.

[16]*See* Federal rec., doc.  46.  This material has been filed into the record under seal.

[17]Specifically, in 1972, Narretta pled guilty to possession of desoxyn and possession of marijuana, pursuant to which she was sentenced to two and a half years incarceration and was placed on five years probation.  A year earlier, in 1971, Narretta pled guilty to possession of marijuana and was sentenced to 18 months probation. Narretta's "rap sheet" indicates that in connection with her desoxyn possession conviction, she may also have been convicted of possession with intent to distribute desoxyn and conspiracy to obtain desoxyn, but there is no state court documentation to support these rap sheet entries.  There is likewise no documentation to support rap sheet entries indicating a 1969 California conviction for visiting premises where narcotics were being used and Louisiana convictions for possessing a shotgun under 20 inches in length and for resisting an officer.

[18]In addition to Narretta's admission that she had a prior drug conviction, Paul Petta, a former neighbor, testified that he had seen Narretta use crack cocaine.  Petta, an admitted "drug addict" facing, at the time he offered his testimony, a life sentence in connection with a distribution of heroin conviction, also stated that Narretta once falsely accused him of burglarizing her apartment and he described Narretta as "a nervous type of person", "kind of flippant", the type of person from

dictates of *Strickler*, *supra*, cannot properly be categorized as material.   Accordingly, petitioner's claim for habeas corpus relief based upon the State's alleged suppression of Narretta's full criminal history is without merit.

Petitioner next claims that a picture taken of the bed where he and Sharon Narretta had intercourse which "depicts no ... blood spot", constituted exculpatory evidence. Therefore, its alleged suppression, according to petitioner, constitutes a *Brady* violation.  In support of his claim, petitioner argues that the prosecution "presented a photograph during trial with a solid blood spot as big as a silver dollar in the center of the bed sheet" and this picture led the jury "to believe the blood came from Ms. Narretta's vagina, and the [S]tate's presentation of the photo vouched for her credibility concerning an act of force, rather than the actual consent."[19]

A copy of the picture allegedly reflecting a "solid blood spot as big as a silver dollar" is attached to petitioner's habeas application in "Appendix A", "Exhibit 1".  Based upon this court's review of said picture, the alleged "solidity" of the blood spot appears to be the result of petitioner's ample use of a red maker, pursuant to which he highlighted the alleged spot and drew a red arrow pointing to it.  Further, this picture was not the only, and certainly not the most persuasive, evidence the State presented reflecting that Ms. Narretta had suffered bleeding as a result of her sexual encounter with petitioner.    Ms. Narretta's testimony to this effect was corroborated by Dr. Michael Wiedemann.  As noted earlier, Dr.

---

whom "you don't know what to expect".  *See* State rec., vol. 21 of 32, pp. 1218-20; 1222, 1224-25.

[19]*See* Federal rec., doc. 1, petitioner's application at pp.18-19.

Wiedemann, who performed a "sexual assault examination" on Ms. Narretta, testified that there was "a mild, bloody discharge coming from [her] cervix."[20]

Based upon the fact that the above evidence, in addition to the picture allegedly depicting a solid silver-dollar sized blood spot on the bed, was presented at trial supporting the fact that Ms. Narretta suffered bleeding in her cervical area as a result of her sexual encounter with petitioner, the court finds that the picture allegedly reflecting no blood spot on the bed cannot be categorized as "material evidence", as defined under *Strickler*, *supra*. Accordingly, its alleged suppression does not constitute a *Brady* violation.

Petitioner also claims that a picture of his apartment's living area was unconstitutionally suppressed. The allegedly suppressed picture was in contrast to the picture provided to the jury, a copy of which is attached to petitioner's habeas application in "Appendix A", which petitioner describes as depicting Sharon Narretta's shoes "scattered in the *middle* of the living room floor".[21] This picture, according to petitioner, "project[ed] the inference to the jury that a struggle took place, supporting their theory of non-consent; as well as vouching for the credibility of Narretta's testimony."[22] Thus, petitioner contends that the suppressed photograph, which depicts petitioner's living area, but without Narretta's shoes, constitutes *Brady* material.

In the instant case, there is no question that Sharon Narretta was in petitioner's

---

[20]*See* discussion *supra* at p. 14.

[21]*See* Federal rec., doc. 1, petitioner's application at p. 19 (emphasis original).

[22]*See* Federal rec., doc. 1, petitioner's application at p. 19.

apartment.  As noted earlier, petitioner admitted at trial that Narretta left her shoes at his apartment, stating:  "I don't know what the big issue is about the shoes, anyway.  I admitted that they were there.  I admitted that I told the detective that they were there.  I don't know what the big issue is about the shoes."[23]  Thus, as with the suppressed picture of petitioner's bed, the allegedly suppressed picture of his living area does not constitute "material evidence" as defined under *Strickler*, *supra*.

Finally, petitioner claims that Mary Wyant's September 7, 1995 statement to the effect that she had been raped in 1977, in Columbus, Ohio, was suppressed.  Petitioner's convoluted reasoning as to why this statement was "material" and, as such, constituted *Brady* material, is as follows.  First, petitioner contends that the suppressed statement supported his testimony that following their sexual encounter, Wyant admitted to petitioner that she had previously been raped.  This confession, according to petitioner,  prompted him to confide to Wyant that he had recently been accused of rape.  Petitioner then states that he proceeded to provide Wyant with the details of his earlier rape of Narretta which petitioner contends that Wyant incorporated into her rape accusation which, petitioner concludes, led the jury, based upon the similarity between the two rapes, to find him guilty.

As stated earlier, in order for suppressed evidence to be considered "material", it must be established that had the evidence been disclosed, it is reasonably probable that the result of the proceeding would have been different.  In this case, for Wyant's statement

---

[23]*See* State rec., vol. 22 of 32, p. 1445, lines 26-32; *see also* discussion *supra* at p. 14.

regarding her earlier rape to have impacted petitioner's proceeding, the jury would have to have believed:  1) That Wyant told petitioner of her earlier rape; 2) that this knowledge prompted petitioner to tell Wyant about his alleged rape of Narretta; and, 3) that Wyant then incorporated the details of Narretta's rape into her rape accusation.  Given the lack of a direct correlation between the two, i.e., Wyant's statement and an impact upon petitioner's proceeding, the court finds it is not reasonably probable that the result of petitioner's proceeding would have been different had the jury been aware of Wyant's statement regarding her earlier rape.

### Claim 3) Ineffective Assistance of Counsel on Appeal

Petitioner argues that he received ineffective assistance of appellate counsel by virtue of counsel's failure to raise on appeal the issue that the trial court erred in failing to sever the two counts of rape lodged against him.  To prove that appellate counsel was ineffective, petitioner must satisfy the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004) (citations omitted*)* ("The familiar *Strickland* framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary

to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. "An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." *U.S. v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), *quoting U.S. v. Acklen*, 47 F.3d 739, 742 (5th Cir. 1995). To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

In this case, as the State notes in its response, "the omitted issue, the denial of the severance of counts, [was] fully litigated prior to the petitioner's trial".[24] Both the defense and the State submitted memoranda on the issue.[25] Review of the pertinent memoranda reflects that there was no dispute that the State's original joinder of the two counts was proper. Louisiana Code of Criminal Procedure Article 493 provides:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

There was no question that the two offenses at issue, the rape of Ms. Narretta and the rape

---

[24]*See* Federal rec., doc. 27, State's response at p. 33.

[25]*See* State rec., vol. 17 of 32, pp. 111-113, 125-130.

of Ms. Wyant, were "of the same or similar character".  However, petitioner challenged the joinder, explaining that he wanted "to testify in one matter, that of Sharon Naretta [sic]", but did not want to testify "in the matter concerning Mary Wyant".  Petitioner argued that by virtue of the fact that his extensive criminal history would come to light when he took the witness stand, he would be prejudiced, in connection with Mary Wyant's rape charge, since Wyant, in contrast to petitioner, had no criminal history.[26]  Accordingly, petitioner argued that the two rape charges lodged against him by Sharon Narretta and Mary Wyant should be severed pursuant to the provisions of Louisiana Code of Criminal Procedure Article 495.1.[27]

The state district court, taking the matter under submission following its receipt of both memoranda, reasoned:

> After reviewing *State v. Feeback*, 414 So.2d 1229 (La. 1982), and *Alvarez v. Wainwright*, 607 F.2d 683 (5th Cir. 1979), the Court finds that a severance is not warranted in this case.  The evidence in the matter before the Court, as in *Feeback*, is simple and distinct as to each charge, and the court will instruct the jury accordingly.  As the Supreme Court noted in *Feeback*, "[s]everance is not required simply because a defendant indicates that he wishes to testify on some counts but not on the others." *Feeback*, 414 So.2d at 1233; citing *Alvarez*.
> This Court finds defendant's claim of prejudice to be without merit,

---

[26]Petitioner did not believe his testimony and accompanying unveiling of his criminal history would prejudice him in connection with Sharon Narretta's charge of rape since Narretta also had a criminal history.

[27]*See* State rec., vol. 17 of 32, pp. 125-126.  Louisiana Code of Criminal Procedure Article 495.1 provides:

> If it appears that a defendant or the state is prejudice by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.

thus a severance is not warranted in this case.[28]

Thereafter, petitioner appealed the adverse decision to the state appellate court and ultimately to the state supreme court which denied petitioner relief.  *See State v. Luna*, 692 So.2d 457 (La. 1997).

Based upon the above-described, extensive review which the issue received prior to trial, the court finds that it is not reasonably probable that but for appellate counsel's failure to raise the severance issue on appeal, the result of the proceedings would have been different.  Accordingly, the court finds that petitioner has failed to show that he was prejudiced and therefore, is not entitled to habeas corpus relief.

### Claim 4:  Failure to Sever

Petitioner claims that the trial court erred in denying his motion to sever and requiring him to stand trial for both the rape charge lodged against him in connection with Ms. Narretta's alleged rape and the rape charge lodged against him in connection with Ms. Wyant's alleged rape.  Petitioner raised this same claim in a state post-conviction application which the state trial court denied on March 6, 2002.  Specifically, the trial court denied petitioner's claim, pursuant to La.C.Cr.P. art. 930.4, determining that petitioner had waived the claim because he knew of its existence at the time of trial and he inexcusably failed to raise it on appeal.[29]  The State contends that as a result of the trial court's ruling, petitioner, with respect to the instant issue, is in procedural default, thereby preventing federal review.

---

[28]*See* State rec., vol. 17 of 32, pp. 132-133.

[29]A copy of the state trial court's Order is contained in the State rec., vol. 8 of 32, tab 11.

The United States Fifth Circuit Court of Appeals has concisely set forth the standards to be used when analyzing whether a petitioner has procedurally defaulted with respect to a particular claim, thereby barring federal habeas review:

> "A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds. Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground."

*Bell v. Cain*, 2002 WL 31002831, *4 (E.D. La. 2002) (Africk, J.), quoting *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).  "When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."  *Id.*, quoting *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).

La.C.Cr.P. art. 930.4 has been recognized, and petitioner does not suggest otherwise, as an "independent and adequate" state ground for purposes of barring federal habeas corpus relief.  *See Washington v. Cain*, 2000 WL 863980, *4 (E.D. La. 2000).  As such, the instant claim is barred from federal review unless "'petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental

miscarriage of justice.'" *Id*. at *5, quoting *Hughes*, 191 F.3d at 614.

Petitioner, in an effort to show the requisite cause, explains that he "pleaded with his appellate counsel, through numerous letters, to raise the issue of severance on appeal", but his "pleas fell on deaf ears".[30]  Accordingly, petitioner "filed a supplement to counsel's brief, raising the severance issue, along with several other claims."[31]  In response, the state appellate court remanded the matter back to the district court, directing that the court rule on petitioner's motion for reconsideration and, thereafter, that petitioner "refile" his direct appeal.[32]  However, in connection with this refiled appeal, petitioner admits that he did not, in a supplemental brief, raise the severance issue on appeal.  Clearly, plaintiff knew full well how to raise the issue on appeal, but failed to do so.  As such, he has failed to show the requisite cause.  "'Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice.'"  *Bell*, 2002 WL at *5, quoting *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996).

Thus, the instant claim is procedurally barred unless petitioner can show that a fundamental miscarriage of justice would result.  To establish a "fundamental miscarriage of justice," a petitioner "must 'make a persuasive showing that he is actually innocent of the charges against him.'" *Id*., quoting *Finley*, 243 F.3d at 220.  As explained by the Fifth Circuit in *Lucas v. Johnson*, 132 F.3d 1069, 1077 (5th Cir. 1998), to demonstrate "actual innocence,"

[30]*See* Federal record, doc. 1, petitioner's habeas application at p. 24.

[31]*See* Federal record, doc. 1, petitioner's habeas application at p. 24.

[32]*See* Federal rec., doc. 1, petitioner's application at p. 24.

a petitioner must "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt...." Petitioner, in this case, has failed to make such a showing. Accordingly, this court is barred from considering petitioner's claim that his constitutional rights were violated by virtue of the trial court's failure to grant his motion to sever.

### Claim 5) Prosecutorial Misconduct

Petitioner claims that "the prosecution's actions during trial amount[ed] to prosecutorial misconduct when he deliberately encouraged and elicited known perjured testimony on several occasions."[33] As with claim 4), petitioner raised the instant claim in connection with his state post-conviction application which the state district court denied on March 6, 2002. As with claim 4), the basis of the state district court's denial of the instant claim was Louisiana Code of Criminal Procedure Article 930.4, determining that petitioner had waived said claim because he knew of its existence at the time of trial and inexcusable failed to raise it on appeal. Similarly, as with claim 4), the State, with respect to claim 5), contends that as a result of the state district court's ruling, petitioner is in procedural default, thereby preventing federal habeas review of claim 5).

As noted above, Louisiana Code of Criminal Procedure 930.4 has been recognized as an "independent and adequate" state ground, as required under *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), for purposes of barring federal habeas corpus

---

[33]*See* Federal rec., doc. 1, petitioner's habeas application at p. 41.

review.  *See Washington*, 2000 WL at *4.  To escape such a bar, petitioner must demonstrate "either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."  *Id.* at *5 (quotation omitted).  Petitioner has failed to make any such showing in connection with claim 5).  Accordingly, this court is barred from considering petitioner's prosecutorial misconduct claim.

### Claim 6:  Improperly Allowed to Proceed Without Counsel

Petitioner argues that he was improperly allowed to represent himself at trial. A review of the pertinent opinion reflects that the Louisiana Fifth Circuit Court of Appeal thoroughly analyzed this issue in connection with petitioner's direct appeal.  The court first observed petitioner's constitutional right to represent himself at trial.

> A defendant in a criminal trial has a constitutional right to represent himself, as recognized in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).  The Sixth Amendment to the United States Constitution "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California,* 422 U.S. at 819, 95 S.Ct. at 2533.  Once informed of the right to counsel, a defendant may intentionally waive that right.  *Johnson v. Zerbst,* 304 U.S. 458, 463-468, 58 S.Ct. 1019, 1023-1024, 82 L.Ed. 1461 (1938); *State v. Strain,* 585 So.2d 540, 542 (La.1991); *State v. Price,* 96-680 (La.App. 5 Cir. 2/25/97), 690 So.2d 191, 195.

*State v. Luna*, 772 So.2d 249, 257 (La. App. 5 Cir. 2000) (footnote omitted).

The Louisiana Fifth Circuit next observed that "[b]ecause an accused managing his own defense relinquishes many of the traditional benefits associated with the right to counsel, he or she must knowingly and intelligently forego those benefits in order to represent himself."  *Id.* (Citations omitted).  The court then examined the steps taken by the

trial court to ensure that petitioner was "knowingly and intelligently" relinquishing his right

to counsel.  Specifically, the court observed:

> In this case, prior to granting the defendant's request to represent himself, the trial judge then inquired into the defendant's background.  When the court questioned the defendant about his education, the defendant responded that he had attended "one term of college."  The defendant also told the court that he had represented himself in 1980 in a "charge of kidnap and ransom" involving his former girlfriend.   After the court informed the defendant that he would be held to the same standard as an attorney in the event he elected to represent himself, the defendant said that he understood.  The judge then told the defendant that he was not convinced the defendant had the requisite legal skills to represent himself without assistance.  Richard Tompson of the Indigent Defender Board was present in court and requested that the court clarify to the defendant that the assisting attorney would not be the defendant's "personal slave."  The judge ruled that the defendant would be permitted to represent himself; however, he also appointed Ms. Davis of the Indigent Defender Board to assist the defendant.

*Luna*, 772 So.2d at 258.

Thereafter, the court examined the pertinent facts reflecting that petitioner's

waiver of counsel was, indeed, valid.

> The defendant filed various pre and post-trial motions that indicate he had knowledge of the legal system.   During voir dire, defendant addressed prospective jurors with respect and asked intelligent questions.   At trial, defendant thoroughly examined witnesses, including vigorous cross-examinations of the State's witnesses.   The record further reflects that the defendant was aware of the seriousness of the penalty he faced.  In one of his many habeas petitions, defendant asserted he would "spend a minimal of 20 flat years of his life in prison, so has stated the prosecutor, if not the remainder of his life."
>
> We also note that the defendant's past experience with the criminal justice system also supports a finding that he understood the waiver of counsel.  *See*, *State v. Norman,* 99-600 (La.App. 5 Cir. 2/16/00), 756 So.2d 525.  At trial, the defendant admitted he had prior convictions for burglary, attempted escape, kidnaping, *forcible rape,* as well as other convictions.  We also note

that defendant informed the judge at the March 27, 1997 *Faretta* hearing that he had previously represented himself in connection with the kidnaping charge.

*Luna*, 772 So.2d at 258 (emphasis original).

Finally, the court examined pertinent state law, identical to applicable federal law, to the effect that "[w]hile an indigent accused has the right to the assistance of counsel, he does not have the right to a particular attorney. *State v. Harper*, 381 So.2d 468, 470; *State v. Bond*, 650 So.2d 354, 358." *Id*.[34] Thus, petitioner's unsupported complaint of "a conflict between himself and *any* Indigent Defender Board attorney", *Id*. (emphasis original),was insufficient for purposes of showing that he was denied counsel by virtue of the trial court's refusal to appoint a non-Indigent Defender Board attorney to represent him.  This fact, along with petitioner's "extensive past experience with the criminal justice system" and his conduct at trial, led the state court of appeal to conclude:  "[T]he totality of the circumstances in this record demonstrates that the defendant validly waived his right to counsel."  *Id*.

The above analysis clearly does not represent an unreasonable application of Supreme Court law to the facts of this case.[35]  Accordingly, petitioner's claim for habeas relief based upon the claim that he was improperly allowed to proceed to trial without counsel is without merit.

----

[34]Similarly, in *Caplin & Drysdale v. United States,* 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989), the United States Supreme Court provided:  "The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."

[35]As noted *supra* at p. 13, the state court's factual findings are "presumed to be correct".

### Claim 7:  Ineffective Assistance of Counsel Prior to Trial and at Trial

#### A.  Pre-Trial

Petitioner argues that John Benz, his appointed pre-trial counsel, was ineffective due to his alleged "agreement" to a reconsideration of the severance issue.[36]  A review of the record, however, reflects that there was no agreement to reconsider the issue. The State, with no authorization from defense counsel, filed a motion to reconsider.[37]  The district court granted the motion,[38] and defense counsel filed an opposition, arguing that the counts were properly severed.[39]  Thereafter, the district court took the matter under submission and ultimately issued a written opinion, granting the State's motion for reconsideration and setting forth its legal basis, as applied to the applicable facts, for doing so.[40]  Accordingly, the court finds that petitioner has failed to satisfy either of *Strickland's* prongs.[41]

#### B.  Trial

It is undisputed that petitioner waived his right to counsel at trial.  On March

---

[36]*See* Federal rec., doc. 1, petitioner's habeas application at p. 61.

[37]*See* State rec., vol. 17 of 32, pp. 111-112.  At a July 2, 1996 hearing, the district court, without issuing written reasons, originally severed the two counts of forcible rape for purposes of trial.  A copy of the July 2, 1996 transcript is contained in "Appendix C" attached to petitioner's federal habeas application.

[38]*See* State rec., vol. 17 of 32, p. 113.

[39]*See* State rec., vol. 17 of 32, pp. 125-129.

[40]*See supra* at p. 23 for discussion regarding applicable analysis.

[41]*See supra* at p. 21 for discussion regarding applicable law set forth in *Strickland*, *supra*.

7, 1997, petitioner filed a "Motion to Proceed Pro Se".[42]  Pursuant to said motion, a hearing

was held on March 25, 1997.  At that hearing, the court engaged in the following colloquy

with petitioner.

> THE COURT:
> How much education do you have, sir?
> Mr. Luna:
> I went to one term of college, sir.
> THE COURT:
> And have you ever represented yourself in any other cases?
> MR. LUNA:
> Once before, in 1980.
> THE COURT:
> And what was that in connection with?
> MR. LUNA:
> That was a charge of kidnap and ransom between my ex-girlfriend and I.
> THE COURT:
> Alright, sir.  You realize that if you represent yourself, if you elect to represent yourself, you're going to be held to the same standard as any lawyer would be held to?  Do you understand that?
> MR. LUNA:
> Yes sir.
> THE COURT:
> I'm not convinced that you are competent in your legal skills to represent yourself without the benefit of some assistance....[43]

Thereafter, following a bench conference and after hearing testimony from Richard

Thompson of the Indigent Defender Board ("IDB"),  the following colloquy ensued:

> THE COURT:
> Mr. Luna, what I've decided is I'm going to allow you to represent yourself.  However, because of my concerns relative to your legal skills and your competency and the standards that you will be held to in representing

---

[42]*See* State rec., vol. 17 of 32, pp. 187-188.

[43]*See* State rec., vol. 19 of 32, p. 607, lines 7-32; p. 608, line 1.

yourself, I'm going to require either Ms. Davis or someone else from the Indigent Defender Board to assist you.  Now, as Mr. Thompson pointed out earlier, by assisting you this is going to be to assist you during the trial itself.  This is not going to be in any way where they are going to be serving as an errand person for you, as a runner for you.  You will be expected to prepare your case and be ready to present it at the time of trial.  If there are procedural questions that you might have, you might want to consult the assistant attorney.  But, they are not going to tell you how to try your case.  They are going to be there for your benefit and I don't think as a result of their assisting you there will be any conflicts.  In other words, they merely sit next to you and if you have no questions of them or they advise you of some improper procedure that you are attempting to follow and you refuse to adhere to their advice, then that responsibility will rest upon your shoulders.  Do you understand me, sir?

MR. LUNA:

    Yes sir.

THE COURT:

    Alright, I believe our trial date is April the 14th.

MR. GRANT (the prosecutor):

    That's correct, Your Honor.

MR. LUNA:

    I would like to note an objection, Your Honor, for the IDB assisting me in this matter.

THE COURT:

    Your objection is noted.[44]

As the Fifth Circuit explained in *Childress v. Johnson*, 103 F.3d 1221, 1231 (5th Cir. 1997) (quotation omitted), in much the same manner as the district court explained to petitioner in the colloquy set forth above, when a defendant is representing himself, with appointed counsel merely assisting him, acting as "standby" counsel, said counsel's "role is one of an observer, an attorney who attends the proceeding and who may offer advice, but who does not speak for the defendant or bear responsibility for his defense."  As such, the

---

[44]*See* State rec., vol. 19 of 32, p. 609, lines 14-32; p. 610, lines 1-26.

defendant electing to represent himself "cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). The Fifth Circuit similarly observed: "[A] pro se defendant cannot complain on appeal that his own defense amounted to a denial of effective assistance of counsel". *Lyles v. Estelle*, 658 F.2d 1015, 1019 (5th Cir. 1981).

      In this case, a review of the trial transcript reflects that petitioner's "standby" counsel not only attended the trial proceeding and offered advice, she invoked Louisiana Code of Evidence Article 609.1, along with applicable case law, to protect petitioner's interest. Specifically, after Sharon Narretta's testimony, during which she admitted that she had a possession of marijuana conviction, counsel moved, albeit unsuccessfully, for a mistrial, offering, on petitioner's behalf, the following supporting argument:

MS. DAVIS ("standby" defense counsel):
    Judge, for the record, under Louisiana Code of Evidence, Article 609.1, attacking the credibility by evidence of convictions or crime in criminal cases, the statute specifically says "Every witness by testifying subjects himself to examination relative to criminal convictions subject to the limitations set forth below." And we asked for the rap sheet of all the State witnesses.
    The State did not produce [Ms. Narretta's] rap sheet[] to us, and the law, specifically, *State v. Miles*, which is cited at 569 So.2d 972, and 571 So.2d 636, and *State v. Laird*, 551 So.2d 1310, and *State v. Lee*, 531 So.2d 254, ... under those cases, the case law specifically says if it is requested prior to the time of trial, the evidence must be – the rap sheets must be turned over.
    We requested them. We were refused them on the basis that they had no prior convictions. In this case the witness, Ms. Narretta, took the stand. When asked about prior convictions, she's indicated she had a marijuana conviction.... [W]e requested the information. We did not receive it. We were denied stating that they had no prior rap sheets, and that's directly contradictory to what the witness herself testified to, and on that basis we

move for a mistrial.[45]

Based upon the above, the court finds that petitioner has failed to make the required showing that he was denied effective assistance of counsel at trial. Accordingly, petitioner's claim for habeas relief based upon counsel's alleged ineffectiveness is without merit.

**Claim 8: Denial of Right to Present a Defense**

Petitioner claims that he was denied due process by virtue of the fact that his right to present a defense was unconstitutionally hampered when the trial court, rather than continuing the trial, proceeded forward even though evidence, in the form of witnesses' testimony, a police report, and a psychiatric evaluation, would not be presented to the jury. With respect to the fact that the trial was not continued, the Louisiana Fifth Circuit Court of Appeal, in connection with its direct appeal decision, *Luna*, 772 So.2d at 255, made the following findings of fact which this court, under the provisions of 28 U.S.C. § 2254(e)(1), may presume to be correct:

> In this case, the record does not reflect that the defendant moved for a continuance before trial commenced on the basis that his witnesses were absent. The record reflects the defendant knew how to request a continuance, since he had filed a motion for a continuance of the April 1997 trial date. The defendant could have requested a continuance, but he did not. Rather, the defendant was satisfied to proceed to trial with the court's issuance of instanter subpoenas and attachments for his witnesses, in the event they failed to appear.
> The record further reflects that after trial had commenced, the defendant continued to request information on the status of his witnesses. Before opening statements on June 24, 1997, the defendant inquired whether his witnesses had been served. Ms. Davis told the court she would check the record for returns on the

---

[45]*See* State rec., vol. 21 of 32, p. 1157, lines 27-32; p. 1158, lines 1-30.

subpoenas. When the court asked the defendant if he had any objection to trial proceeding, since the State was going to present its case first, the defendant responded, "No. I don't have any objection to that, Your Honor."

At the end of the day, the court revisited the issue of the defendant's instanter subpoenas. After reviewing the defendant's subpoena list with the trial court's minute clerk and with Ms. Davis, the court ordered that all of the subpoenas were to be reissued for those witnesses who were not served, and that attachments were to be issued for those who had been served.

The next morning after four State witnesses had testified, the defendant advised the court that some of his witnesses still had not been served. He requested "ample time" for the subpoenas to be served and moved that the court consider issuing attachments for those witnesses who had been served, but had still not appeared. The trial court responded that the defendant would be allowed to proffer the absent witnesses' testimony at the end of the day, at which time the court would determine whether it was necessary to issue attachments for any of the witnesses. The defendant thanked the court and did not object to the court's ruling.

The next morning, June 26, 1997, the court inquired on the status of the returns. After discussion between Ms. Davis, the defendant, and the court, it was determined that the record reflected some, but not all of the witnesses had been served. The court issued attachments for those witnesses who had been served but who had not appeared. The defendant proffered the testimony of some of the witnesses. Thereafter, the discussion turned to the issue of jury instructions, and the defendant still did not move to recess trial.

In *Schrader v. Whitley*, 904 F.2d 282, 288 (5th Cir. 1990), the Fifth Circuit explained that there are two hurdles which a habeas petitioner must overcome in order to show that a court's failure to continue a trial resulted in a due process violation. A petitioner must prove an "abuse of discretion" on the part of the trial court and "must sustain the burden common to due process claims that 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted'". *Id.*, quoting *Kirkpatrick v. Blackburn*, 777 F.2d 272, 279 (5th Cir. 1985) (*per curiam*), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). This court shall first examine the prejudice component of the above test.

Petitioner complains that he was prejudiced due to the trial court's failure to continue the trial because it precluded him from offering into evidence a four-page police report which "contradicted Ms. Narretta's trial testimony, and would have been used to attack her credibility on many key and material factors".[46]   Specifically, petitioner points to the following differences between what Ms. Narretta stated at trial and what she informed Detective Marcus Toony, as reflected in his police report:  1) The report reflected that Narretta left her top on during sex, but at trial she stated that her top was off; 2) the report reflected that after leaving petitioner's apartment, Narretta hid under a vehicle for two hours, but at trial, she never claimed to have hid under a vehicle; 3) the report reflected that "an ambulance arrived on the scene", but according to her trial testimony, "there was no ambulance on the scene"; 4) the report reflected that Narretta "refused medical attention", but at trial she stated that "she didn't refuse medical attention"; 5) the report reflected that Narretta was "thrown on a small army type bed", but at trial, she made no mention of being on "a small bed"; 6) the report reflected that during questioning, Narretta "was staggering", but at trial, she indicated that she "had one drink over a span of several hours".[47]  Petitioner also notes that the police report does not contain the following information to which Narretta attested to at trial:  That she bled and that, as a  result of the large knife petitioner was using to cut-up chicken, she was fearful for her life.  According to petitioner, these matters were not contained in the police report because "none of these factors existed at the time she gave

---

[46]*See* Federal rec., doc. 1, petitioner's habeas application at p. 66.

[47]*See* Federal rec., doc. 1, petitioner's habeas application at pp. 66-67.

36

her statement to Deputy Marcus Toney [sic]."[48]

Relatively minor inconsistencies, such as the ones set forth above, between a victim's police statement and trial testimony, in particular in situations such as this, where the victim is traumatized and/or has been drinking at the time she spoke to police, generally lack the requisite materiality to support an alleged due process violation. *See generally Bonnell v. Mitchel,* 301 F.Supp.2d 698, 727-728 (N.D. Ohio 2004). Further, during petitioner's cross-examination of Narretta, she admitted that she was hysterical when she spoke with police and could not remember what she told them.

Q. Did you tell the police officer that night - -
A. I don't remember. I was hysterical and in shock....[49]

Under such circumstances, the fact that Ms. Narretta may have failed to mention to the investigating officer certain details, such as the size of petitioner's knife and her resulting fearfulness, is insufficient for the purpose of showing that such details did not exist.

In connection with his rape of Ms. Narretta, petitioner claims that his right to due process was violated because witnesses James Sanders and "Mr. Warren" were unable to provide testimony on behalf of the defense. Petitioner claims that James Sanders would have testified that while they were in the bar together, before going to petitioner's apartment, he observed Ms. Narretta kiss petitioner. Further, Sanders would have stated that "the cut off jean shorts the [S]tate presented at trial were not the same ones worn by Narretta" on the

---

[48]*See* Federal rec., doc. 1, petitioner's habeas application at p. 67.

[49]*See* State rec., vol. 21 of 32, p. 1081, lines 29-31.

date at issue.[50]  Mr. Warren, the manager of the apartment complex where petitioner lived, "would have testified there was no phone jack in any of the apartment[] living rooms at the complex".[51]

Because petitioner was not prejudiced by the fact that the above two witnesses did not testify at his trial, their absence did not constitute a due process violation.  Whether or not a phone jack was present in the living area of petitioner's apartment was immaterial.  Ms. Narretta testified that she had unsuccessfully attempted to use the telephone while she was in petitioner's apartment and petitioner, himself, verified this testimony, stating, at trial:

> [W]hen I came back into the living room, she [Ms. Narretta] said that there was something wrong with my phone.  And my brother had put a twenty-five foot extension cord on the phone.  And I told her, well, I've [had] problems with it and that there's possibly a short in the line.[52]

Likewise, whether or not Ms. Narretta kissed petitioner prior to leaving the bar with him and proceeding to his apartment, has little bearing, in terms of materiality, with respect to what occurred once they were inside the apartment.  Additionally, the alleged materiality of testimony from Sanders to the effect that the cut off jeans presented into evidence at trial were not the same cut off jeans he saw Ms. Narretta wearing two years earlier, when the event at issue occurred, is significantly undercut by the trial testimony reflecting that the cut

---

[50]*See* Federal rec., doc. 1, petitioner's habeas application at p. 67.

[51]*See* Federal rec., doc. 1, petitioner's habeas application at p. 67.  Ms. Narretta testified at trial that the phone in petitioner's living area was unplugged and she had unsuccessfully attempted to plug it in.

[52]*See* State rec., vol. 22 of 32, p. 1304, lines 5-11.

off jeans introduced into evidence by the State were, in fact, the cut off jeans worn by Ms. Narretta on the date at issue. Detective Hebert testified that following the incident, he transported Ms. Narretta to Lakeside Hospital and remained there while she was examined by Dr. Michael Wiedemann. Following the examination, Detective Hebert took custody of the cut off jeans from Dr. Wiedemann and identified the jeans introduced into evidence as the same ones he received from Dr. Wiedemann.[53]

In connection with his rape of Ms. Wyant, petitioner claims he was denied due process because witnesses Gregg Hoppe, Helen Taylor, Joyce Brown, and David Ford, were not available to testify. Hoppe, Taylor and Brown would have testified with respect to Ms. Wyant's friendliness toward petitioner prior to accompanying him to his apartment, and Ford would have testified with respect to her friendliness toward petitioner after leaving his apartment.[54] Again, however, what occurred before and after the victim and petitioner entered petitioner's apartment is of only tangential importance. Of relevance is what transpired inside the apartment.[55]

Petitioner next complains that, by virtue of the court's decision to proceed to trial, he was not "afforded a psychological examination to refute Wyant's depiction of him

---

[53]*See* State rec., vol. 21 of 32, pp.1124-25.

[54]*See* Federal rec., doc. 1, petitioner's habeas application at p. 68.

[55]Petitioner also complains that he was prejudiced as a result of the district court's decision to proceed to trial because witnesses Douglas Luna and Martin Dunn were not available to offer testimony. *See* Federal rec., doc. 1, petitioner's habeas application at p. 68. However, petitioner fails to set forth what the substance of these witnesses' testimony would have been.

as having a Jekyll and Hyde personality."[56]   However, Wyant's depiction did not constitute an expert opinion.  Rather, it represented nothing more than Wyant's opinion and petitioner, having been allowed to testify at trial, had ample opportunity to refute Wyant's opinion.

Finally, petitioner complains that in light of the fact that several defense witnesses, such as Hoppe, Taylor, Brown, Sanders, Ford and Warren, were not available to testify at trial, he should have been allowed "to have the investigator testify as to his findings in regards to the investigation of which he personally talked with the majority of the defense witnesses, if not all".[57]   However, as petitioner was not prejudiced as a result of the fact that the above defense witnesses did not offer testimony at trial, he likewise was not prejudiced as a result of the fact that the investigator did not testify at trial.  Accordingly, petitioner suffered no due process violation.[58]

## RECOMMENDATION

It is therefore **RECOMMENDED** that the application for federal habeas

---

[56]*See* Federal rec., doc. 1, petitioner's habeas application at p. 68.  Though not specified in his application, petitioner is apparently referring to Mary Wyant's testimony, at the May 28, 1996 preliminary hearing, to the effect that petitioner's behavior would swing back and forth", treating her roughly one minute then, a minute later, becoming "nice again".  *See* State rec., vol. 19 of 22, pp.567H.

[57]*See* Federal rec., doc. 1, petitioner's habeas application at p. 69.

[58]As noted earlier, under *Schrader*, *supra*, petitioner was required to overcome two hurdles with respect to his claim that he suffered a due process violation by virtue of the trial court's failure to continue his trial.  He was required to show that the trial court's action, in failing to continue the trial, constituted an "abuse of discretion" and that he was prejudiced by the court's action in this regard.  Having determined that petitioner has failed to show the requisite prejudice, there is no need for the court to examine the "abuse of discretion" prong.

corpus relief filed on behalf of petitioner, Johnny Luna, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this __24th__ day of _____October_____, 2006.

LOUIS MOORE, JR.

United States Magistrate Judge